IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| ANTHONY R. HUGHES, | ) | |
| | ) | Civil No. 07-1850-JE |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

David B. Lowry
Columbia Business Center, Suite 235
9900 Southwest Greenburg Road
Portland, Oregon 97223

       Attorney for Plaintiff

Kent Robinson
United States Attorney, District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 Southwest Third Avenue, Suite 600
Portland, Oregon 97204-2902

Leisa A. Wolf

FINDINGS & RECOMMENDATION - 1

Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Anthony R. Hughes brings this action pursuant to 42 U.S.C. 405(g), seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI).    For the reasons set out below, the Commissioner's decision should be affirmed.

### Procedural Background

Plaintiff filed applications for DIB and SSI on August 24, 2000, alleging that he had been disabled since November 5, 1998, because of a neck and shoulder injury.  Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff requested review by an Administrative Law Judge (ALJ), and a hearing was held before ALJ Joseph D. Schloss on March 13, 2002.  Plaintiff, who was represented by counsel; Larry S. Hart, Ph.D., a medical expert (ME); and Dennis J. Elliott, a vocational expert (VE); testified at the hearing.  Lawrence J. Cohen, M.D., and VE Elliott submitted post-hearing responses to ALJ Schloss's additional questions concerning plaintiff's limitations.

In a decision filed August 1, 2003, ALJ Schloss found that plaintiff could work as a telephone solicitor and a surveillance system monitor, and accordingly was not disabled within the meaning of the Social Security Act (the Act).

FINDINGS & RECOMMENDATION - 2

On October 27, 2004, the Appeals Council remanded the claim following plaintiff's request for review.  The Council instructed the ALJ to perform a function-by-function assessment of plaintiff's ability to do work-related mental activities; to clarify the severity of plaintiff's alcohol abuse; to consider plaintiff's maximum residual functional capacity (RFC); and to obtain supplemental evidence from a VE regarding the vocational effect of plaintiff's limitations.

A second hearing was held before ALJ Catherine R. Lazuran on August 5, 2005. Plaintiff, who was represented by counsel; VE Elliott, and ME James Haynes, M.D.; testified at the hearing.

In a decision filed March 25, 2006, ALJ Lazuran found that plaintiff could work as a seedling sorter, gate guard, or a flagger, and accordingly was not disabled within the meaning of the Act.

On November 13, 2007, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  Plaintiff now seeks review of that decision.


**Factual Background**

Plaintiff was born on July 11, 1960.  He was 38 years old at the alleged onset of his disability, and was 45 years old when ALJ Lazuran issued her decision denying his applications for benefits.

Plaintiff has an 11th grade education.  He has relevant past experience as a welder, fabricator, and mill worker.

Plaintiff last worked regularly on November 5, 1998, the date of his alleged onset of disability.  He has not engaged in substantial gainful activity since that time.


## Medical Record

### A.    Plaintiff's injuries

Plaintiff's neck problems began long before the alleged onset of disability.  In 1988 a heavy steel bar fell on plaintiff's neck and shoulder.  Subsequent x-ray and MRI testing on August 2, 1994, showed moderate degenerative disc disease at C6-7 creating a moderate spinal stenosis and moderate bilateral C7 neural foramen stenosis; a congenital blocked vertebra at C2-3 and a narrowing of the left 3rd and 6th intervertebral foramina.  Electromyelographic (EMG) testing showed mild neuropathy at the wrist and elbow.

On November 5, 1998, a truck frame on jack stands collapsed on plaintiff's posterior neck and shoulder.  The examining physician noted congenital fusion at C2-C3 and degenerative disc disease in the lower cervical spine, but found "no evidence of acute fracture or subluxation." Plaintiff was given Vicoprofen and a soft collar, and told to stop working until Eric T. Sandefur, M.D., an orthopedic surgeon, instructed otherwise.

Dr. Sandefur compared an MRI taken on November 10, 1998, with the August 2, 1994 MRI and found that plaintiff's degenerative disc disease had stabilized at C6-C7, but "markedly increased at C3-4 and C5-6."  He recommended physical therapy to improve plaintiff's range of motion and eliminate some of the radicular pains, and kept plaintiff off work.  After noting no improvement by December 14, 1998, Dr. Sandefur referred plaintiff to Perry E. Camp, M.D., a neurosurgeon, for evaluation.

On January 28, 1999, Dr. Camp diagnosed symptomatic cervical spondylosis with an equivocal right C6 deficit, probable carpal tunnel syndrome, and a smoking addiction.  Dr. Camp referred plaintiff to Kenneth H. Z. Isaacs, M.D., a neurologist, for another EMG test for median neuropathy.  Dr. Isaacs observed "active denervation in C6-C7 myotomes" with "interval loss of biceps reflex and some sensory changes in first digit . . . most consistent with the C6 injury." There was mild interval worsening of median neuropathy in the right wrist and mild ulnar neuropathy. Dr. Isaacs concluded that the persistent mild prolongation of ulnar sensory latencies at plaintiff's right wrist was not correlated with plaintiff's reported symptoms unilaterally.

**B.**    **Plaintiff's application for worker's compensation benefits**

After his November 1998 injury, plaintiff applied for worker's compensation benefits. An independent medical evaluation performed on March 23, 1999, attributed plaintiff's neck and shoulder pains largely to preexisting conditions, recommended no specific additional treatment, and released plaintiff for medium level work.  On May 7, 1999, Dr. Sandefur opined that plaintiff could not return to work as a welder, and that vocational rehabilitation was necessary.

On July 24, 1999, a second independent evaluation compared plaintiff's 1994 and 1998 MRI results and found natural progression of cervical degenerative disc disease.  Preexisting degenerative disc disease, and not the November 1998 injury, was identified as the major contributor to plaintiff's condition, symptoms, disability, and need for treatment.

Plaintiff re-applied for worker's compensation on August 4, 1999.  An August 30, 1999 independent evaluation found that plaintiff's multilevel cervical spondylosis, C2-3 congenital vertebral body fusion, right wrist carpal tunnel syndrome, and right elbow neuropathy were unrelated to or predated the November 1998 injury.  The  cervical radiculopathy at the C6 and

C7 nerve roots was considered probably related to the November 1998 injury. The report indicated that plaintiff's carpal tunnel syndrome, and not the radiculopathy, prevented plaintiff from returning to work.

Based on this report, SAIF denied plaintiff's claim. Plaintiff appealed, and settled the claim for $2,000 on January 5, 2000.

**C.      Plaintiff's initial applications for DIB and SSI**

When plaintiff applied for DIB and SSI on August 24, 2000, he had not worked for almost two years. Several doctors reported on his mental and physical status before the March 13, 2002 hearing.

Disability Determination Services (DDS) hired medical experts to evaluate plaintiff's eligibility for DIB and SSI. David W. Allen, M.D., Ph.D., examined plaintiff on September 21, 2000. Dr. Allen noted plaintiff's history of cervical spine flexion injury and right shoulder pain, his tobacco addiction, and his alcoholism, which was in remission. He recommended that plaintiff's neck be re-evaluated. Dr. Allen opined that, if surgery was not required, plaintiff should "be involved in a work-hardening program." Based on "the state of his hands and good muscle strength," Dr. Allen concluded that plaintiff was "obviously capable of doing physical activity but may well be pain limited."

In an October 2, 2000 report sent to DDS, Dr. Lawrence E. Green, a neurologist, found a "history of degenerative disc disease at the cervical spine with a basically normal neurological examination." He recommended specific investigation of plaintiff's alleged carpal tunnel syndrome.

FINDINGS & RECOMMENDATION - 6

Plaintiff continued visiting Dr. Sandefur through the time of the first hearing.  In his examination of a current MRI scan on October 24, 2000, Dr. Sandefur observed degenerative disc disease at C3-4, C5-6, and C6-7; persistent mild ectopia of the cerebellar tonsils; and congenital fusion of C2-3, which was "essentially unchanged from the previous examination of 11-10-98."   He referred plaintiff to Dr. Christian Zimmerman, a neurological surgeon, for further evaluation.

Dr. Zimmerman found that an MRI taken November 30, 2000, showed a "right anterior cord deformity, which was not completely described in the prior report."  He recommended anterior cervical diskectomy and fusion at C3-4 with allograft and plating.  Plaintiff agreed, and surgery was performed on January 15, 2001.

Plaintiff initially reported a "dramatic improvement in his posterior shoulder and neck pain," and on March 7, 2001, was told that, after 6 weeks, he could return to work with no heavy lifting or sustained work above his head for two to three months.  After plaintiff missed a CT scan scheduled for mid-April 2001, another CT scan was scheduled, and pain medications were prescribed.  On April 26, 2001, plaintiff reported that his pain had returned.

In a letter dated July 11, 2001, sent to Paige Grooms, plaintiff's vocational counselor at the Oregon Department of Health and Human Services, Dr. Zimmerman stated that, despite his lingering neck and shoulder problems, plaintiff  "would be trainable at this time for reintegration into a work place."  On January 31, 2002, Dr. Zimmerman reported "objective findings are without reflex asymmetry and/or weakness and that there is no myelopathic symptomology and/or difficulties with ambulation."

After his surgery, plaintiff followed up with Dr. Petterson to receive pain medication prescriptions and advice on non-narcotic treatments and exercise.  Dr. Petterson found that, in

FINDINGS & RECOMMENDATION - 7

addition to his cervical problems, plaintiff had developed a lumbar disc bulge.  Dr. Petterson advised against epidural pain shots in plaintiff's upper back.  William G. Binegar, M.D., an anesthesiologist, observed only minimal intervertebral foramina compromise, and agreed with that advice.  Nevertheless, plaintiff received pain shots from Dr. Binegar in May and June, 2003.  Plaintiff also administered home therapy with a TENS unit.  Later plaintiff reported that "he [felt] he [was] doing significantly better than before."  However, by late June, plaintiff reported that the epidural injections were not as effective and discussed the possibility of a morphine sulfate pump implant with Dr. Petterson.

An extensive record addressing plaintiff's mental condition was also developed before the first hearing.  Vocational counselor Grooms scheduled several examinations.  On August 31, 2000, Nancy Archer, M.Ed., diagnosed reading, math, and writing disorders, and opined that plaintiff could find employment if these disorders were properly accommodated.

On October 9, 2000, plaintiff was referred to David J. Blakley, L.C.S.W., for a bio-psycho social history and mental status examination.  Blakley diagnosed a reading disorder, an adjustment disorder with mixed anxiety and depressed mood caused by plaintiff's degenerative disc disease and carpal tunnel syndrome, and psycho-social stressors including loss of ability to work, decreased income, and chronic pain.  Plaintiff declined regular therapy.  Blakley assigned plaintiff a Global Assessment of Functioning (GAF) score of 60 and opined that his problems were "primarily medical and loss of functioning."

DDS referred plaintiff to Dwight D. Mowry, Ph.D., for a psychological examination. On December 19, 2000, Dr. Mowry administered several tests, including WAIS-III and MMPI-2, and conducted an extensive interview.  Dr. Mowry concluded that none of these tests revealed significant mental impairments to plaintiff's ability to seek employment "as long as there is some

FINDINGS & RECOMMENDATION - 8

attention to the limitations of his physical condition."  Dr. Mowry diagnosed a depressive

disorder NOS, a pain disorder associated with psychological factors, and a general medical

condition.

      After conducting a second mental status examination on July 24, 2001, Blakely

diagnosed an adjustment disorder with mixed anxiety and depressed mood caused by plaintiff's

degenerative disc disease and pain medication.  He assigned plaintiff a GAF score of 60.


**D.**      **Medical record developed after the first hearing**

      1.  <u>Record concerning physical problems</u>

      Plaintiff's physical condition fluctuated after ALJ Schloss issued the first decision

denying his applications for disability benefits.  On September 16, 2003, Dr. Petterson noted that

plaintiff wanted "a second opinion from another pain management physician" and considered a

second neck surgery.  Dr. Petterson observed plaintiff's "neck pain and right shoulder pain are

not is [sic] aggravating as his bilateral leg pain."  On October 17, 2003, Dr. Petterson observed

that despite his lumbar disc bulge, plaintiff had no ataxia and could "walk on his heels and toes

without difficulty [and] squat without difficulty."

      In early March, 2004, plaintiff complained of a sharp increase in his neck and shoulder

pain.  By August 2004, narcotics treatments helped to relieve the pain.

      Dr. Green performed nerve conduction analyses between August and October, 2004.  In

his final report, Dr. Green stated that plaintiff had "mild median nerve compression at the wrist

probably aggravated by repetitive hand motion but probably not restrictive to his continuing to

do some of those kinds of activities."  Dr. Green doubted plaintiff's assertion that he had trouble

using the "clicker on the mouse" used to operate a computer.  He encouraged plaintiff to wear

wrist splints and to return for conduction studies in a year if he remained symptomatic.  He also told plaintiff to continue with his current level of activities.

On November 5, 2004, plaintiff reported new symptoms, including "spasticity, sensory loss in his new symptoms of spasticity, sensory loss in his upper and lower extremities, incontinence and clonus of the lower extremities across the ankle."  Dr. Petterson ordered an MRI with Loreli Smith, M.D., to rule out multiple sclerosis and L5 radiculopathy.  Dr. Smith diagnosed only early degenerative disc disease predominantly at the L3-L4 and L5-S1 levels, with no spinal stenosis, and a low potential for radiculopathy.  Dr. Smith also noted "no focal findings to clearly explain a right foot drop" that plaintiff exhibited.

In December, 2004, plaintiff had "more and more complaints of discoordination of the upper and lower extremities, chronic upper extremity and muscle discomfort, [and] difficulty thinking and remembering."  Dr. Petterson referred plaintiff to Jennings Falcon, M.D., a neurologist.  On December 29, Dr. Falcon ruled out multiple sclerosis and Parkinson's disease and concluded that "bilateral median and ulnar neuropathies will meaningfully account for the entirety of his symptomatology."  Dr. Falcon also noted "a 'functional' gait disturbance" with no "anatomical-physiological basis."

On January 8, 2005, Dr. Petterson noted that plaintiff "dramatizes his functional disabilities with a weird gait throwing his left leg out to the left, holding his hands awkwardly."

2.  <u>Record concerning mental condition</u>

In December, 2001, plaintiff began attending sessions with vocational counselor Grooms at Mountain Valley Mental Health Programs, Inc. (Mountain Valley).  He took antidepressants semi-regularly.  However, despite his mother's death in a house fire in March, 2002, and his concern that the Social Security hearing "went bad," Grooms and her colleagues observed a

FINDINGS & RECOMMENDATION - 10

general improvement in plaintiff's mental condition throughout 2002.  On July 20, 2002, plaintiff's GAF was reported at 65.  Grooms later wrote that plaintiff showed "slow progress with adjustment to his disability conditions," complicated only by his chronic neck and shoulder pain and mounting financial difficulties.  In July, 2003, Grooms assigned plaintiff a GAF score of 71.

On September 30, 2003, Grooms wrote that plaintiff was "in crisis and has fleeting suicidal thoughts without a plan or apparent stated means.  This is related to his denial for SSDI . . . ."  However, in subsequent visits, Grooms noted plaintiff's apparent improvement.

On  January 8, 2004, Jeff Clausel, Ph.D., performed a psychological examination of plaintiff.  Dr. Clausel interviewed plaintiff, performed a mental status examination, and reviewed plaintiff's medical history.  He diagnosed a chronic pain disorder, associated with psychological factors and a general medical condition, and adult onset dysthymia.  Dr. Clausel suspected a personality disorder NOS with antisocial and immature features.  He assigned a GAF score of 75. In terms of work-related activities, Dr. Clausel observed "absolutely no impairment in [plaintiff's] ability to quickly and efficiently carry out simple 1- 2- and 3-step instructions," and no major impairment in concentration, appropriate social interaction, and adaptive skills.

A few days after Dr. Clausel's examination, Grooms referred plaintiff to Dr. Thomas J. Heriza.  On January 15, 2004, Dr. Heriza diagnosed a major depressive episode of moderate severity, mixed anxiety, chronic pain syndrome, and an adjustment disorder.  He rated plaintiff's GAF score at 50-55.  Dr. Heriza reported that plaintiff's "verbal skills and language appear much better than what prior psychological testing would suggest," and concluded that plaintiff did not "exhibit any gross cognitive deficits in regards to memory, attention, and concentration."

Plaintiff continued to meet with Grooms over the next few months.  He started to attend group therapy classes and received follow-up consultations with Dr. Heriza on April 1 and

April 16, 2004.  Dr. Heriza assigned the same diagnosis as in January, 2004, but noted that

plaintiff's mood had improved with the use of Remeron medication.  Clinic records indicate that

plaintiff failed to attend group therapy sessions after mid-April, 2004.


## Second Hearing Testimony

On August 5, 2005, plaintiff and David P. Lowry, his current attorney, appeared before

ALJ Lazuran.  VE Elliott attended the hearing, and Dr. Haynes, a medical expert, participated by

telephone.

Dr. Haynes testified that plaintiff did not meet or equal the listings for cervical

radiculopathy or cervical radiculopathy requiring two extremities.  Acknowledging that he was

"just an amateur psychologist," Dr. Haynes testified that psychological issues had some impact

on plaintiff's ability to work.

Plaintiff testified as follows at the hearing.  Plaintiff could not work because his hands no

longer functioned.  He could not finish computer classes because of the pain.  He had given up

fishing and hunting, his favorite hobbies.  His girlfriend had to dress him.  He had problems with

headaches, leg pain, neuropathy, incontinence, bronchitis, anxiety, panic attacks, learning

disorders, and depression.  He had suicidal ideation and crying spells.  His pain medications

helped somewhat with his pain, but the side effects disrupted his sleep, limiting him to four

hours per night with occasional two to four hour daytime naps.

Plaintiff could lift 20 pounds occasionally, could stand on and off for four or five hours,

and could sit for four hours in an eight-hour day.  He could not walk more than "a couple of

blocks" in an eight-hour day.  He still smoked, but had tried to stop.  He could go to the grocery

store and go walking for a few blocks, alone or with his daughter and her stroller.  He took care

FINDINGS & RECOMMENDATION - 12

of his daughter during most of the day, and had taken care of his mother from November 1998 until her death in March, 2002.

Counseling helped somewhat. Plaintiff stopped taking anti-depressants because the side effects caused him physical harm. He no longer got along with people.

In his hypothetical to VE Elliott, ALJ Lazuran described a person of plaintiff's age, education, and past relevant work experience who could "lift 20 pounds occasionally and 10 pounds frequently, can stand and walk about six of eight hours, and sit about six of eight hours, should not do overhead work, should avoid vibration such as would be involved with the use of power tools." The VE testified that the hypothetical individual could not perform plaintiff's past relevant work, but could work as a seedling sorter, a gate guard, and a flagger.

Plaintiff's counsel added limitations to the ALJ's hypothetical, describing a person who would have a reduced work pace at the light and sedentary level of exertion, significant interference in attention and concentration, could not stand, sit, or walk for more than two hours during an eight-hour day, and who had several other physical restrictions. Plaintiff's counsel also added mental impairments to the ALJ's hypothetical. The VE testified that an individual with those physical or mental impairments could not sustain competitive employment.

### Disability Analysis

The ALJ applies a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Claimant bears the burden of proof from steps one to four; the burden shifts to the Commissioner at step five. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.1999). The Commissioner applies the five steps as summarized below. Id.

FINDINGS & RECOMMENDATION - 13

Step One.  Is the claimant presently engaged in substantially gainful activity (SGA)?  If so, the claimant is "not disabled."  If the claimant is not engaged in SGA, the Commissioner's evaluation proceeds to Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  Does the claimant have one or more medically determinable severe impairments?  If not, the claimant is "not disabled."  If the claimant has at least one severe impairment, the Commissioner's evaluation proceeds to Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Do claimant's severe impairments meet or equal one of the impairments listed in the SSA's regulations (20 C.F.R. Pt. 404, Subpt. P., App. 1.)?  If so, the claimant is "disabled."  If not, the Commissioner's evaluation proceeds to Step Four.

Step Four.  Does the claimant have the RFC to do any work that he or she has done in the past?  If so, the claimant is "not disabled."  If the claimant cannot do any of his or her past work, the Commissioner's evaluation proceeds to Step Five.

Step Five.  Can the Commissioner find any other work that the claimant can do, considering his or her RFC, age, education, and work experience?  The Commissioner must show that a significant number of relevant jobs exist in the national economy.  20 CFR § 404.1560(b)(3).   A significant number of jobs exists if demonstrated by either a vocational expert or the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. 4, App. 2.  If the Commissioner finds any other work in significant numbers that the claimant can do, the claimant is "not disabled" and thus not entitled to disability insurance benefits.  If the Commissioner cannot meet this burden, the claimant is "disabled."  See 20 C.F.R. § 404.1520(f).

## The Second ALJ Decision

Step One.  ALJ Lazuran found that plaintiff had not engaged in SGA since the date of his alleged onset of disability.

Step Two.  ALJ Lazuran found that plaintiff's "cervical degenerative disc disease; degenerative disc disease at L3-4 and L5-S1; right wrist carpal tunnel syndrome; right elbow ulnar neuropathy; an adjustment disorder with mixed anxiety and depressed mood; a learning disorder [primarily in reading]; chronic pain syndrome due to psychological factors and a general medical condition; and alcohol abuse, in long term remission" were "severe" impairments within the meaning of the relevant Social Security regulations.

Step Three.  ALJ Lazuran found that plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I.  In reaching this conclusion, ALJ Lazuran reconciled the conflicting reports concerning depression by crediting Dr. Clausel's findings of dysthymia and chronic pain disorder, and highlighting plaintiff's failure to follow through on medication and counseling despite their efficacy.  The ALJ concluded that plaintiff's allegations of panic attacks and anxiety were unsupported by the medical record, and noted that plaintiff's alcoholism was in long-term remission.

Step Four.  ALJ Lazuran found that plaintiff retained the functional capacity needed "to lift and carry twenty pounds on a [sic] occasional basis and ten pounds on a frequent basis; he can sit, stand, and walk for at least six hours in an eight-hour workday; he should avoid overhead work and avoid vibration involved with the use of power tools; and he can do simple, routine, repetitive work."  Based upon this RFC, ALJ Lazuran found that plaintiff could not perform his past relevant work.

FINDINGS & RECOMMENDATION - 15

Step Five.  ALJ Lazuran found that plaintiff could perform "light, unskilled" jobs that existed in substantial numbers in the national economy, including work as a seedling sorter, gate guard, and flagger.  Accordingly, she found that plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir.1995),  cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir.1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred because she: (1) improperly rejected the opinions of the primary treating mental health experts, plaintiff's treating physician, and lay witnesses; (2) failed to properly assess plaintiff's credibility; (3) failed to develop the record concerning plaintiff's mental impairments as required by SSR 96-7p; (4) failed to properly assess plaintiff's RFC pursuant to SSR 96-8p; and (5) failed to include all of plaintiff's impairments in the hypothetical she posed to VE Elliott.


1.    ALJ's Consideration of Treating Mental Health Experts, Treating Physician, and Lay Witnesses

Plaintiff contends that ALJ Lazuran improperly rejected the medical opinions of treating mental health experts and physicians without giving clear and convincing reasons for doing so.

Generally, the ALJ is the "final arbiter with respect to resolving ambiguities in the medical evidence." Tommassetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir.2008).  The ALJ is not bound by an expert medical opinion on the plaintiff's disability.  20 C.F.R. §§ 404.1527(e). However, the opinions of treating physicians are given greater weight than the opinions of other physicians, because treating physicians have a greater opportunity to know and observe their patients. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir.1989).

An ALJ must provide "clear and convincing" reasons for rejecting uncontradicted medical opinions, and must provide "specific and legitimate" reasons for rejecting a contradicted medical opinion.  Morgan v. Apfel, 169 F.3d 595, 600 (9th Cir.1999).  The burden of providing "specific and legitimate" reasons is met when an ALJ provides "a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).

**A.    Dr. Heriza**

Plaintiff argues that ALJ Lazuran failed to accord Dr. Heriza, a psychiatrist, the weight to which he was entitled as a treating doctor, and, in fact, failed to give his opinion any weight whatsoever.   This argument fails.  ALJ Lazuran did not reject or fail to give weight to Dr. Heriza's opinions.  Instead, she acknowledged plaintiff's treatment history at Mountain Valley, including his treatment by Dr. Heriza, and relied on many of Dr. Heriza's observations in reaching her conclusions as to the severity of plaintiff's mental impairments.  ALJ Lazuran correctly noted, though Dr. Heriza diagnosed plaintiff with major depression of moderate severity, his reports indicated that plaintiff's mental condition improved with treatment, and that his sleep problems resolved over time.  Dr. Heriza expressed no opinion about the vocational effects of plaintiff's impairments.   Consequently, ALJ Lazuran's conclusion that plaintiff retained the functional capacity to work was not inconsistent with Dr. Heriza's observations and opinions.

**B.    Counselor Grooms**

Plaintiff argues that the ALJ improperly rejected the opinion reflected in the reports of Ms. Grooms, plaintiff's vocational counselor.  Again, I disagree.  ALJ Lazuran did not reject the opinions in Grooms' reports.  Instead, she cited and relied on Grooms' Mountain Valley Clinic records from 2001 to 2004 showing that, though therapy and anti-depressants improved his initially severe mental problems,  plaintiff failed to reliably attend those sessions and take his prescribed medication.  Plaintiff relies on Grooms' remarks in 2001 and 2002 suggesting that plaintiff might not benefit from vocational rehabilitation.  However, the ALJ correctly noted that these remarks were inconsistent with Grooms' later notes and evaluations of plaintiff's GAF, which indicated that plaintiff's impairments were significantly less severe.

FINDINGS & RECOMMENDATION - 18

C.    **Dr. Mowry**

Plaintiff argues that ALJ Lazuran improperly cited the psychological examination of

Dr. Mowry, an examining psychiatrist, as evidence that plaintiff retained an overall ability to

function with some mild to moderate psychological limitations.  Plaintiff argues that ALJ

Lazuran should have placed more significance on Dr. Mowry's opinions that plaintiff could

perform "sedentary work activities as long as there is some attention to the limitations of his

physical condition," and that plaintiff's concentration and attention are impaired.  I disagree.  The

ALJ accurately cited Dr. Mowry's report, and the portions of his opinions that plaintiff contends

should have been accorded greater significance are not inconsistent with the portions that the

ALJ cited, with other substantial evidence in the medical record, or with the ALJ's ultimate

conclusion that plaintiff is not disabled.

D.    **Dr. Clausel**

Plaintiff argues that ALJ Lazuran gave undue weight to the psychological examination

performed by Dr. Clausel, an examining psychiatrist, because it contradicts all other evidence in

the record concerning plaintiff's mental condition.  I disagree.  Dr. Clausel's findings were fully

consistent with the results of objective tests he administered and the mental status exam he

performed, and with substantial evidence in the medical record he reviewed.   Like Dr. Heriza

and the Mountain Valley therapists, Dr. Clausel noted that plaintiff had some mental

impairments.  In those areas in which his opinion differed from those of other experts,

Dr. Clausel supported his conclusions by substantial objective evidence, including reference to

other evidence in the medical record.  ALJ Lazuran did not err in crediting Dr. Clausel's opinion.

E.    **Dr. Haynes**

FINDINGS & RECOMMENDATION - 19

Plaintiff suggests that Dr. Haynes should not have been allowed to testify at the hearing because he offered an opinion on plaintiff's physical and mental condition without having reviewed the entire record.  I disagree.  Assuming for the purposes of this discussion that the ALJ erred in allowing Dr. Hayes to testify, plaintiff's counsel invited the error by asking the ALJ to question Dr. Haynes after learning that he had not had an opportunity to fully review the record.  See Tracy v. Astrue, 518 F.Supp.2d 1291, 1305 (10th Cir.2007) (plaintiff in Social Security case barred from raising issue on appeal when plaintiff's counsel induced or invited the alleged error).   Dr. Haynes received a second packet of medical records the night before the hearing, and plaintiff's counsel gave him an additional packet on the day of the hearing.  ALJ Lazuran observed that the record was "so out of order that [it was] almost a puzzle," and expressed discomfort at allowing Dr. Haynes to testify without reviewing the entire record.  Plaintiff's counsel nevertheless asked the ALJ to ask Dr. Haynes "if he thinks there's a meeting or equaling in the listings based on what he's seen so far."  ALJ Lazuran acceded to the request, noting that she was doing plaintiff "a favor."  If the ALJ erred in allowing Dr. Haynes to testify, this was an error which plaintiff's counsel invited, and one of which plaintiff cannot now complain.

Though plaintiff contends that Dr. Haynes should not have been allowed to testify, he also argues that Dr. Haynes's testimony concerning plaintiff's psychological problems should have been more fully developed, and that the ALJ should have relied more heavily on Dr. Haynes's conclusion that he had a severe mental impairment.  This argument also fails.  ALJ Lazuran provided clear and convincing reasons for rejecting Dr. Haynes's testimony that plaintiff had a severe mental impairment.  ALJ Lazuran noted that, by his own admission, Dr. Haynes was only an "amateur psychologist," and thus was unqualified to opine as to plaintiff's mental

FINDINGS & RECOMMENDATION - 20

limitations.  In addition, ALJ Lazuran correctly noted that Dr. Haynes's opinion concerning

plaintiff's mental limitations was speculative, "vague and unclear."  Dr. Haynes based his

opinion only on Dr. Heriza's report:  He had not read Dr. Clausel's report, and speculated as to

the effect of plaintiff's use of morphine and methadone.  Under these circumstances, the ALJ's

rejection of Dr. Haynes's opinion was fully supported.

**F.     Dr. Petterson's Questionnaire**

Dr. Petterson, plaintiff's treating physician, completed a questionnaire in which he

described plaintiff's physical and mental limitations as disabling.  Plaintiff argues that ALJ

Lazuran inappropriately rejected the questionnaire.

This argument fails.  ALJ Lazuran gave clear and convincing reasons for rejecting

Dr. Petterson's opinions as to the effects of plaintiff's physical impairments.  ALJ Lazuran

correctly noted that the opinions reflected in the questionnaire were inconsistent with

Dr. Petterson's own treatment notes.  The ALJ noted that Dr. Petterson's treating records noted

only a decreased range of motion in plaintiff's neck and no loss of strength or reflex.  The ALJ

observed that Dr. Petterson's notes indicated that plaintiff was not willing to exercise as

recommended and dramatized his pain behaviors.  ALJ Lazuran also cited substantial medical

evidence that plaintiff was significantly less impaired than Dr. Petterson's questionnaire

indicated.  She noted that neurologists Dr. Green and Dr. Haynes found little evidence

supporting plaintiff's complaints of nerve entrapment and arm and wrist pain, and correctly noted

that these doctors had more expertise than Dr. Petterson in neurological disorders and they

offered opinions that were more consistent with the medical evidence.

ALJ Lazuran also provided clear and convincing reasons for rejecting Dr. Petterson's

opinion that plaintiff could not handle stress and was unable to work due to depression.  The ALJ

FINDINGS & RECOMMENDATION - 21

also noted that Dr. Petterson's opinion as to plaintiff's mental limitations was not consistent with the objective testing in the medical record, and correctly observed that the ultimate determination of disability is a matter for the Commissioner, not for plaintiff's physician.

**G.    Lay Witnesses Lori Jackson and Cindy Boyd**

Lay testimony concerning a claimant's symptoms or the effects of a claimant's impairments is competent evidence which must be considered.  20 C.F.R. § 404.1513(e)(c) (Commissioner will consider observations by non-medical sources concerning effect of impairments on claimant's ability to work.)  An ALJ who rejects such testimony "must give reasons that are germane for doing so."  Dodrill v. Shalala, 12 F.3d 915, 989 (9th Cir. 1993). Germane reasons include inconsistencies between lay testimony and the medical record. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir.2006).

Lori Jackson, plaintiff's girlfriend, submitted a questionnaire and a letter in which she reported that plaintiff's pain, numbness, depression, suicidal ideation, and crying spells render him unable to function.  Plaintiff argues that ALJ Lazuran gave no specific and germane reasons for rejecting this testimony.  I disagree.  ALJ Lazuran explained that Jackson's testimony was inconsistent with the objective physical and mental evidence in the record and with plaintiff's own testimony concerning his daily activities.  This explanation provided the required support for the ALJ's rejection of Jackson's testimony.

Cindy Boyd, plaintiff's computer instructor, submitted a letter stating that plaintiff's limitations prevented him from completing classes.  Plaintiff argues that ALJ Lazuran gave no specific and germane reasons to reject Ms. Boyd's testimony.  However, as with Jackson, ALJ Lazuran cited inconsistencies between Boyd's testimony and the objective record, and adequately supported rejection of the lay testimony.

FINDINGS & RECOMMENDATION - 22

2.    ALJ's Credibility Determination

ALJ Lazuran found that plaintiff's "medically determinable impairment could reasonably be expected to produce some of the alleged symptoms," but that his statements concerning the "intensity, duration and limiting effects of these symptoms are not entirely credible."  Plaintiff contends that the ALJ erred in failing to provide the required support for this conclusion.

An ALJ is responsible for determining credibility. Andrews, 53 F.3d 1035, 1039 (9th Cir.1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir.1998), (citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir.1990) (*en banc*)).  Unless there is affirmative evidence that a claimant is malingering, the ALJ must provide "clear and convincing" reasons supported by substantial evidence for rejecting the claimant's testimony. Tommasetti, 533 F.3d at 1039-40 (9th Cir.2008).

In evaluating a claimant's credibility, the ALJ may consider: (1) ordinary methods of credibility evaluation, including the claimant's reputation for veracity, prior inconsistent statements concerning symptoms, and other testimony by the claimant that reflects upon the claimant's credibility; (2) unexplained or inadequately explained failure to seek treatment or follow a course of treatment prescribed; (3) the claimant's daily activities; (4) objective medical evidence; (5) opinions from medical sources; (6) the location, duration, frequency, and intensity of symptoms; (7) precipitating and aggravating factors; (8) the type, dosage, effectiveness, and side effects of medications; (9) treatment other than medication; and (10) statements from the claimant and others regarding the claimant's symptoms and limitations. 20 C.F.R. § 404.1529(c); Smolen v. Chater, F.3d 1273, 1284-85 (9th Cir.1996).

ALJ Lazuran cited substantial evidence that plaintiff malingered and exaggerated his symptoms. She cited Dr. Petterson's chart notes indicating that plaintiff was "malingering with respect to his recurrent [bronchial] infection" and Dr. Clausel's observation that plaintiff exaggerated his symptoms. She also cited Dr. Petterson's suspicion that plaintiff was "dramatizing the situation" and "looking for an excuse to have another problem." The ALJ noted that both Dr. Falcon and Dr. Smith reported that plaintiff dropped his right foot in "an exaggerated fashion" that had no objective medical support, and that Dr. Petterson observed that plaintiff manifested "a weird gait throwing his <u>left</u> leg out to the left" [emphasis added]. This evidence provided ample support for the conclusion that plaintiff exaggerated his symptoms.

ALJ Lazuran also cited evidence that plaintiff failed to seek treatment and follow prescribed courses of treatment. She correctly noted that, though Dr. Petterson repeatedly urged plaintiff to give up tobacco because of his bronchitis, and Dr. Heriza recommended that plaintiff stop smoking as a way of reducing his "pain burden," plaintiff made little effort to quit. She noted that plaintiff was inconsistent in taking antidepressants, despite their positive effect on his mood. The ALJ also noted that, though both Dr. Petterson and Dr. Heriza recommended that he take up a regular exercise program to reduce his pain and rehabilitate himself for work, plaintiff did not do so. ALJ Lazuran correctly observed that these actions undermined plaintiff's credibility.

ALJ Lazuran also found that plaintiff's daily activities were "not consistent with one those [sic] of a person who is totally disabled." She cited plaintiff's own testimony that he shopped for groceries, walked his two-year-old daughter and pushed her stroller, traveled to Boise, and drove daily.

FINDINGS & RECOMMENDATION - 24

Finally, ALJ Lazuran cited substantial objective medical evidence that was inconsistent with plaintiff's testimony about the severity of his impairment. She noted that several physicians had concluded that plaintiff could return to employment despite his acknowledged problems. The ALJ cited the following examples of this evidence. In September, 2000, Dr. Allen found no tenderness in plaintiffs' arms and hands, and recommended that plaintiff be involved in a "work-hardening program" because of his good hand and muscle strength. Dr. Zimmerman opined in July, 2001, that the plaintiff "would be trainable. . . for reintegration into a work place" after he recovered from surgery. Several physicians observed little medical evidence for plaintiff's alleged problems. Dr. Smith found "no focal findings to clearly explain right foot drop," and no spinal stenosis. Dr. Binegar observed minimal intervertebral foramina compromise. Dr. Green's conduction study only revealed "mild" or "very mild" nerve compression.

The ALJ cited ample support for her conclusion that plaintiff was a malingerer. Though this relieved her of the further obligation to do so, she also cited clear and convincing reasons for rejecting plaintiff's testimony as to the severity of his impairments.


3.    Development of the Record

An ALJ has a duty to help develop the record. Armstrong v. Commissioner, 160 F.3d 587, 589 (9th Cir.1998); 20 C.F.R. §§ 404.1512(d)-(f). An ALJ also has a duty to further develop the record when the evidence is ambiguous or is inadequate to allow for proper evaluation of the evidence. E.g., Widmark v. Barnhart, 454 F.3d 1063, 1068-69 (9th Cir.2006); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir.2001). An ALJ generally has broad discretion to determine when a consultative examination is needed. Reed v. Massanari, 270 F.3d

FINDINGS & RECOMMENDATION - 25

838, 842 (9th Cir.2001).  Such an examination is necessary only if the evidence as a whole is not sufficient to support a decision on a claim of disability.  20 C.F.R. § 404.1519a(b).

Plaintiff argues that the ALJ should have further developed the record regarding his severe depression, suicidal ideation, anxiety with panic attacks, crying spells, and insomnia, and that the ALJ failed to question the plaintiff's physicians about the impact of his mental impairments.  Plaintiff bases this argument on Dr. Petterson's questionnaire concerning his mental impairments.

The record here does not support plaintiff's contentions that ALJ Lazuran erred in failing to consider his mental impairments in evaluating his residual functional capacity, and that more evidence was needed to properly evaluate his impairments.  As discussed above, plaintiff's allegations concerning the severity of his limitations were not supported by the objective medical evidence.  In addition, the record concerning plaintiff's mental condition had been adequately developed through mental status evaluations and testing.  ALJ Lazuran therefore was not required to request an additional consultative examination.

4.     ALJ's Assessment of Plaintiff's Residual Functional Capacity

Plaintiff contends that ALJ Lazuran did not assess his residual functional capacity properly because she failed to assess his function-by-function limitations, failed to assess his ability to work on a regular and continuing basis, and failed to account for his borderline intellectual functioning and the side effects from medication.  Based upon a careful review of the medical record and the ALJ's decision, I conclude that ALJ Lazuran did not err in assessing plaintiff's residual functional capacity.

As to plaintiff's function-by-function limitations, plaintiff argues that ALJ Lazuran failed to address his depression, anxiety, and sleep disorder. ALJ Lazuran was not required to recite each work function listed in the regulations. Magallenes, 881 F.2d at 755. Nevertheless, she summarized the conflicting evidence concerning plaintiff's mental health in detail, and set out her reasons for concluding that the objective record did not support the conclusion that plaintiff could not perform work-related functions because of mental impairments. ALJ Lazuran also cited Dr. Heriza's report that plaintiff no longer had problems with sleep.

Plaintiff argues that ALJ Lazuran erred in failing to assess his ability to work on a regular and continuing basis, or for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. However, an ALJ's residual functional capacity determination ordinarily implies that work on such a regular and continuing basis has been accounted for, Magallenes, 881 F.2d at 755, and ALJ Lazuran explicitly stated that the RFC limitations she found apply to an "eight hour workday".

Plaintiff also argues that ALJ Lazuran did not properly consider his reduced concentration, stamina, and pace, along with his reports of side effects from medication. I disagree. ALJ Lazuran did not include these limitations in plaintiff's residual functional capacity because they were not supported in the record. Dr. Clausel's evaluation and the Mountain Valley records show no chronic reporting of reduced concentration, stamina, and pace, and plaintiff offered no objective evidence that his medications produced "bad side effects." See Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir.2002) (plaintiff has the burden of producing objective evidence for bad side effects). Therefore, ALJ Lazuran reasonably resolved the evidence, and her decision to omit these alleged limitations from her residual functional capacity determination was adequately supported.

FINDINGS & RECOMMENDATION - 27

Lastly, plaintiff argues that ALJ Lazuran's residual functional capacity determination is incomplete because it does not incorporate his borderline intellectual functioning. I disagree. ALJ Lazuran cited Dr. Clausel's report indicating that plaintiff showed no impairment to quickly carry out simple one, two, and three step instructions, and accounted for mild intellectual impairment by limiting plaintiff to "simple, routine, repetitive work" in her residual functional capacity analysis.

5.    <u>Adequacy of the ALJ's Vocational Hypothetical</u>

To constitute substantial evidence for a disability determination, an ALJ's hypothetical to a VE must set out all of the claimant's limitations. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1101 (9th Cir.1999). The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and supported by the medical record." <u>Id</u>. If the assumptions in the hypothetical are not supported by the record, a VE's opinion that a claimant can work does not constitute substantial evidence. <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1456 (9th Cir.1984).

Plaintiff contends that the hypothetical that ALJ Lazuran posed to the VE was incomplete because it failed to include a limitation for plaintiff's impaired hands and wrists, and because it described an individual who could perform light, unskilled work despite the absence of substantial evidence that plaintiff has that ability. I disagree. ALJ Lazuran's RFC determination accounted for plaintiff's limitations as described in the medical record, and her conclusion that plaintiff could perform light, unskilled work was well supported. ALJ Lazuran's hypothetical specifically restricted plaintiff to avoid overhead work and avoid vibration involved with the use of power tools. Her imposition of these limitations was supported by the medical record and accounted for plaintiff's hand, wrist, and elbow difficulties. Under these circumstances, the VE's

FINDINGS & RECOMMENDATION - 28

Case 3:07-cv-01850-JE    Document 39    Filed 09/09/09    Page 29 of 29

testimony that an individual with plaintiff's residual functional capacity could perform unskilled

work as a seedling sorter, gate guard, and flagger constitutes substantial evidence for ALJ

Lazuran's finding that plaintiff was not disabled within the meaning of the Act.


## Conclusion

Plaintiff's request for an Order reversing the Commissioner's Decision and remanding

this action for a reward of benefits should be denied, and a judgment should be entered

dismissing this action with prejudice.


## Scheduling Order

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due September 25, 2009.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

DATED this 9th day of September, 2009.


        /s/ John Jelderks
John Jelderks
United States Magistrate Judge

FINDINGS & RECOMMENDATION - 29